Edward Cramp, Esq. (SBN 212490)
E-mail:      EMCramp@duanemorris.com
Patricia P. Hollenbeck, Esq. (SBN 121765)
E-mail:      PHollenbeck@duanemorris.com
Karen L. Alexander, Esq. (SBN 265926)
E-mail:      KLAlexander@duanemorris.com
**DUANE MORRIS LLP**
750 B Street, Suite 2900
San Diego, CA 92101
Telephone: 619.744.2200
Facsimile:  619.744.2201

Attorneys for Plaintiffs/Counter-Defendants
AMERICAN CAREER COLLEGE, INC. and
WEST COAST UNIVERSITY, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| American Career College, Inc., a California corporation, and West Coast University, Inc., a California corporation<br><br>                Plaintiffs,<br><br>      v.<br><br>Mario Oswaldo Medina, Sr. a/k/a Mario Oswaldo Medina Ortiz, a/k/a Mario Oswaldo Ortiz, a/k/a Mario M Ortiz, a/k/a Mario Oswaldo Medino a/k/a, Mario Ortiz Medina, an individual; Roger Adolfo Ortiz, a/k/a Roger Ortiz, a/k/a Roger Aofl Ortiz, an individual; Rolando Valdivia, a/k/a Raul Valdez; a/k/a Raul Val, an individual; Unete Healthcare Associates, L.L.C., doing business as Pronto Wellness, a California limited liability company, and DOES 1 -100, inclusive.<br><br>              Defendants. | Case No. 2:21-CV-00698-PSG-SK<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Filed concurrently with Statement of Undisputed Facts; Declarations of Patricia P. Hollenbeck, Susan Pailet and Renee Schweitzer; and [Proposed] Order<br><br>Hearing:    July 8, 2022<br>Time:       1:30 p.m.<br>Ctrm:       6A<br>Judge:     Hon: Philip S. Gutierrez<br><br>Filed: January 26, 2021 (upon removal)<br>SAC Filed: June 18, 2021<br>TAC Filed: February 17, 2022<br>Counterclaim Filed: July 2, 2021 and March 31, 2022 |

AND RELATED COUNTERCLAIM

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 8, 2022, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 6A in the above-entitled Court, Plaintiffs American Career College, Inc. ("ACC") and West Coast University, Inc. ("WCU") (collectively, "Plaintiffs") will move this Court for an Order granting partial summary judgment against all Defendants on certain claims in this action pursuant to Federal Rule of Civil Procedure 56.

The Court should grant partial summary judgment against Defendants Mario Oswaldo Medina ("Medina") and Rolando Valdivia ("Valdivia") on Plaintiffs' breach of duty of loyalty claim (Twelfth Cause of Action) because the undisputed facts show that Medina and Valdivia breached their duties of loyalty owed to Plaintiffs by (inter alia):

1. Concealing their relationship to Defendants Roger Adolfo Ortiz ("Ortiz") and Únete Healthcare Associates, L.L.C, d/b/a Pronto Wellness ("Pronto");

2. Working to further Pronto's interests over Plaintiffs' interests while employed by Plaintiffs, without Plaintiffs' knowledge or consent;

3. Lying about their relationship to Defendants Ortiz and Pronto;

4. Secretly profiting from their lies and omissions;

5. Recruiting other employees to work for Pronto

6. Misrepresenting the demand for Pronto;

7. Failing to reveal conflicts of interest;

8. Concealing and failing to disclose material facts relating to the subject matter of Pronto;

9. Profiting at the expense of Plaintiffs; and

10. Threatening loss of clinical partnerships if Plaintiffs did not use Pronto.

The elements of a cause of action for breach of a duty of loyalty under California law are: (1) the existence of a relationship giving rise to a duty of loyalty;

(2) one or more breaches of that duty; and (3) damage proximately caused by that breach. *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (2007). All employees owe "an undivided duty of loyalty" to their employer during the course of their employment. *Id*. at 414. Undisputed proof of any of the above enumerated breaches supports partial summary judgment against Medina and Valdivia.

Medina and Valdivia's breaches of duty of loyalty have caused Plaintiffs harm in the form of hundreds of thousands of dollars in lost profits, among other pecuniary damages. Plaintiffs seek partial summary judgment against Medina and Valdivia finding them liable on Plaintiffs' breach of duty of loyalty claim, with the amount of damages to be subsequently determined.

Additionally, the Court should grant partial summary judgment against Defendants Ortiz and Pronto on Plaintiffs' aiding and abetting breach of duty of loyalty claim (Thirteenth Cause of Action) because the undisputed facts show that Defendants Ortiz and Pronto:

1.  Knew that Medina and Valdivia were employed at ACC;

2.  Encouraged Valdivia and Medina to breach their duties of loyalty by (inter alia) employing them to work for Pronto, directing/encouraging them to promote Pronto's interests over Plaintiffs', and paying them for helping promote Pronto's intersts; and

3.  Substantially assisted Medina and Valdivia in the breach of their duties of loyalty.

This Motion is based on this Notice of Motion and Motion; the accompanying Statement of Uncontroverted Facts and Conclusions of Law; the accompanying Memorandum of Points and Authorities; the supporting declarations of Patricia P. Hollenbeck, Susan Pailet and Renee Schweitzer, and the pleadings and papers filed in this action; and such further argument and matters as may be offered at the time of the hearing of this Motion.

1         This Motion is made following the conference of counsel pursuant to L.R. 7-3,

2    which took place on May 6, 2022.

3    Dated: May 13, 2022           **DUANE MORRIS LLP**

4

5               By:  */s/ Patricia Hollenbeck*

6               Edward M. Cramp, Esq.
           Patricia P. Hollenbeck, Esq.

7               Karen L. Alexander, Esq.

8               Plaintiffs/Counter-Defendants
           American Career College, Inc. and

9               West Coast University, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

1

# TABLE OF CONTENTS

2

                                                                   **Page**

3    I.     INTRODUCTION ...................................................................................... 1

4    II.    THE PARTIES ......................................................................................... 1

5           A.     ACC and WCU ............................................................................. 1

6
            B.     Mario Medina .............................................................................. 2
7
            C.     Rolando Valdivia ......................................................................... 2
8
9           D.     Roger Ortiz .................................................................................. 3

10          E.     Pronto Wellness ........................................................................... 3

11   III.   FACTUAL BACKGROUND .................................................................... 3

12          A.     Plaintiffs' Relationships With Clinical Partners Are Essential To the
13                 Success of Their Nursing Programs ............................................. 3

14          B.     Pronto Emerges As a Competitor to ACC and WCU .................. 4

15          C.     Mario Medina Advances Pronto's Interests While Working for ACC
16                 ...................................................................................................... 4

17                 1.     Medina Cements The Relationship Between Pronto and College
18                        Medical Center, One of Plaintiffs' Clinical Partners ....................... 5

19                 2.     Medina Is Instrumental In Convincing ACC To Work With Pronto
20                        ...................................................................................................... 5

21                 3.     Medina Conceals His Ties to Pronto ................................................ 6

22                 4.     Medina Recruits Other ACC Employees To Work for Pronto ........ 6

23                 5.     Medina Ensures ACC Pays Pronto's Improper Invoices ................ 6

24          D.     Rolando Valdivia Promotes Pronto's Interests While Working for
25                 ACC .............................................................................................. 7

26                 1.     Valdivia Pressures Plaintiffs to Use Pronto ................................... 7
27
                   2.     Valdivia Conceals His Identity From Plaintiffs .............................. 7
28

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

3.    Valdivia Uses His Inside Knowledge From ACC To Solicit Business For Pronto .......................................................................... 8

4.    Valdivia Devotes His Time, Talents, and Expertise To Promoting Pronto's Competing Business ............................................................ 8

E.    Pronto and Ortiz Aid and Abet Medina and Valdivia's Double Dealing ............................................................................................ 8

F.    Defendants Caused Plaintiffs Substantial Damages ................................. 9

IV.   STATEMENT OF LAW ..................................................................................... 11

A.    Summary Judgment Standard ...................................................... 11

B.    Breach of the Duty of Loyalty ...................................................... 11

C.    Aiding and Abetting Breach of the Duty of Loyalty ............................... 12

V.    ARGUMENT ....................................................................................................... 12

A.    Plaintiffs Are Entitled To Partial Summary Judgment On the Duty of Loyalty Against Medina ............................................................. 13

1.    Medina Owed Plaintiffs a Duty of Loyalty ................................. 13

a.    Medina's Duty of Loyalty to ACC ...................................... 13

b.    Medina's Duty of Loyalty to WCU ..................................... 13

2.    Medina Breached His Duty of Loyalty to Plaintiffs ..................... 14

a.    Medina Acted On Behalf of Pronto, Whose Interests Were Adverse to Plaintiffs ................................................ 15

b.    Medina Used His Position With ACC to Obtain a Material Benefit For Himself, His Brother, and His Brother's Company ............................................................ 17

3.    Medina's Breach of Duty Caused Plaintiffs to Suffer Harm ......... 17

B.    Plaintiffs Are Entitled To Partial Summary Judgment On the Duty of Loyalty Against Valdivia ......................................................... 18

1.    Valdivia Owed Plaintiffs a Duty of Loyalty ................................. 18

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

a.      Valdivia Owed A Duty of Loyalty to ACC ......................... 18

b.      Valdivia Owed A Duty of Loyalty to WCU ...................... 19

2.      Valdivia Breached His Duty of Loyalty to Plaintiffs ................... 19

a.      Valdivia Acted On Behalf of Pronto, Whose Interests Were Adverse to Plaintiffs ................................................. 19

b.      Valdivia Materially Benefitted From His Double Dealing............................................................................... 20

3.      Valdivia's Breach of Duty Caused Plaintiffs to Suffer Harm ....... 20

C.      Plaintiffs Are Entitled To Partial Summary Judgment On Aiding and Abetting the Duty of Loyalty as To Defendants Ortiz, Pronto ............... 20

VI.     CONCLUSION ................................................................................. 22

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Celotex Corp. v. Catrett*

5
    477 U.S. 317 (1984)....................................................................... 11

6

*County of Marin v. Deloitte Consulting LLP*

7
    836 F.Supp.2d 1030 (N.D. Cal. 2011)................................................ 17

8

*Erhart v. BofI Holding, Inc.*
    (S.D. Cal., Mar. 31, 2020, No. 15-CV-02287-BAS-NLS) 2020 WL

9
    1550207 ........................................................................12-13, 18

10

*Faraday&Future, Inc. v. Evelozcity, Inc.*

11
    No. CV 18-737-DMG, 2018 WL 11346536 (C.D. Cal. Aug. 9, 2018)................. 13

12

*Greenwich Ins. Co. v. Media Breakaway*

13
    LLC, 2009 WL 2231678 (C.D. Cal. July 22, 2009)................................. 11

14

*Lujan v. Nat'l Wildlife Fed'n*

15
    497 U.S. 871 (1990)........................................................................ 11

16

*McIndoe v. Huntington Ingalls Inc.*
    817 F.3d 1170 (9th Cir. 2016) ......................................................... 11

17

18

*PQ Labs, Inc. v. Yang Qi*
    (N.D. Cal. No. 12-0450 CW, Jan. 29, 2014) 2014 WL 334453 ............................. 13

19

20

*Richardson v. Reliance Nat'l Indem. Co.*
    (N.D. Cal. No. C–99–2952, Mar. 9, 2000) 2000 WL 284211 ............................... 13

21

*Royal Indus. v. Monogram Indus.*

22
    (C.D.Cal. Nov. 29, 1976, Nos. CV 76-3348-R, CV 76-3356-R) 1976

23
    U.S.Dist.LEXIS 12090 ................................................................... 13

24

*Skyline Advanced Technology Services v. Shafer*
    (N.D. Cal., Dec. 14, 2021, No. 18-CV-06641-CRB) 2021 WL

25
    5908387 ......................................................................16-17, 20

26

*Sunrider Corp. v. Bountiful Biotech Corp.*

27
    No. SACV081339DOCAJWX, 2010 WL 11596235 (C.D. Cal. June 4,

28
    2010) ..................................................................................... 12

*Thomas Weisel Partners LLC v. BNP Parabas*
 (N.D. Cal. No. C 07-6198 MHP, Apr. 1, 2010), 2010 WL 1267744 ..................... 14

*Valenzuela v. ADT Sec. Servs., Inc.*
 820 F. Supp. 2d 1061 (C.D. Cal. 2010) ................................................... 11

**California Cases**

*Arriaga v. Lara*
 (Cal. Ct. App., Mar. 2, 2020, No. H046183) 2020 WL 995141 ........................... 16

*ChromaDex, Inc. v. Elysium Health, Inc.*
 (C.D. Cal., Jan. 16, 2020, No. SACV 16-2277-CJC (DFMx), 2020
 WL 1279236 ......................................................................... 18

*Huong Que, Inc. v. Luu*
 150 Cal. App. 4th 400 (2007) ......................................................... 12

*J.C. Peacock, Inc. v. Hako*
 196 Cal. App. 2d 353 (1961) .......................................................... 17

*Mamou v. Trendwest Resorts, Inc.*
 165 Cal.App.4th 686 (Cal. Ct. App. 2008) ............................................. 15

*Medipro Medical Staffing, LLC v. Certified Nursing Registry, Inc.*
 (Cal. Ct. App., Feb. 4, 2021, No. B294391) 2021 WL 387879
 (unpublished opinion) ............................................................... 21

*Sequoia Vacuum Systems v. Stransky*
 229 Cal.App.2d 281 (Cal. Ct. App. 1964) ............................................. 15

*Softchoice Corp. v. En Pointe Techs., Inc.*
 No. SC088295, 2006 WL 3350798 (Cal. Super. Ct. Nov. 13, 2006)....................... 12

*Stokes v. Dole Nut Co.*
 41 Cal. App. 4th 285 (1995) .......................................................... 12

*Techno Lite, Inc. v. Emcod, LLC*
 44 Cal.App.5th 462, 473 (Cal. Ct. App. 2000)......................................... 15

**Rules**

Fed. R. Civ. P. 56(a) ................................................................. 11

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs American Career College, Inc. ("ACC") and West Coast University, Inc. ("WCU") (collectively, "Plaintiffs") seek partial summary judgment against Defendants Mario Oswaldo Medina ("Medina"), Rolando Valdivia ("Valdivia"), Roger Adolfo Ortiz ("Ortiz") and Únete Healthcare Associates, L.L.C, dba Pronto Wellness ("Pronto") (collectively, "Defendants") as follows:

## I.   INTRODUCTION

Plaintiffs hired Medina and Valdivia to acquire new, support existing, and otherwise manage Plaintiffs' relationships with healthcare providers that provide the statutorily required clinical sites for Plaintiffs' students.  The Defendants abused their positions of trust, access to Plaintiffs' proprietary information, and goodwill as Plaintiffs' representatives to build a groundswell of demand for their start-up business that was/is directly adverse to Plaintiffs' interests.  All the while, they actively concealed and lied to Plaintiffs, clinical sites, and other schools about their relationship with—and compensation received from—the adverse business.

Because the undisputed evidence shows that (1) Medina and Valdivia owed a duty of loyalty to Plaintiffs, (2) Medina and Valdivia breached their duty of loyalty, and (3) Plaintiffs suffered harm as a direct result of Medina and Valdivia's actions, Plaintiffs are entitled to partial summary judgment on their breach of duty of loyalty claim against Medina and Valdivia.  And because Pronto and Ortiz (1) knew the Medina and Valdivia were employed by ACC, (2) knew that Medina and Valdivia's underlying conduct constituted a breach of their duty of loyalty to their employer, and (3) provided substantial assistance and encouragement to such conduct, Plaintiffs are entitled to partial summary judgment on their aiding and abetting claims against Pronto and Ortiz.

## II.   THE PARTIES

### A.   ACC and WCU

ACC and WCU are postsecondary educational institutions that offer

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

healthcare programs to students in California and elsewhere.  (SUF 1.)  They are sister institutions under common ownership.  (SUF 1.)

## B.  Mario Medina

Defendant Mario Medina was hired by ACC on July 23, 2009.[1]  (SUF 2.)  On June 22, 2015, Medina was promoted to Executive Director of Strategic Partnerships.  (SUF 3.)  He served in this role until October 19, 2020.  (SUF 3.)  His role involved "maintaining, acquiring, and overall clinical management of over 300 facilities."  (SUF 4.)  His job duties included, among other things, developing relationships with directors at hospitals and ACC's other clinical partners, and providing support and direction to ACC's directors of clinical education and clinical coordinators.  (*Id.*)  He participated in ACC's annual "Institutional Effectiveness Review" and Plaintiffs' joint Strategic Planning meetings addressing opportunities and objectives for ACC's clinical programs.  (SUF 5.)

At the outset of his employment, Medina agreed to abide by the terms and conditions of an Associate Handbook and an Associates Code of Ethical Conduct including, among other things, that he not engage in any conduct constituting an actual or potential conflict of interest with ACC, not take on a second job that could create a conflict with his work at ACC without prior written permission, and not disclose ACC's confidential business/proprietary information and/or trade secrets, including information relating to Plaintiffs' clinical affiliations.  (SUF 6.)

From January 2018 to December 2020, ACC paid Medina more than $150,000 per year.  (SUF 7.)

## C.  Rolando Valdivia

Rolando Valdivia was hired by ACC as the Student Experience Manager, Clinical, on February 5, 2018.  (SUF 8.)  He served in this role until December 3, 2020.  (*Id.*)  In this role, among other things, he helped "develop, secure and maintain clinical sites" for all ACC clinical programs.  (SUF 9.)  In this position,

---

[1] Mr. Medina was previous employed by Plaintiffs as a Career Services Specialist in 2006 [SUF 52]

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

Valdivia reported to Medina.  (SUF 10.)  Like Medina, Valdivia also agreed to abide by the terms and conditions of ACC's Associate Handbook and the Associates Code of Ethical Conduct when he began his employment.  (SUF 11.)  From February 2018 to December 2020, ACC paid Valdivia more than $80,000 per year.  (SUF 12.)

### D.   Roger Ortiz

Roger Ortiz is Mario Medina's brother.  (SUF 13.)  He is the chief executive officer of Pronto Wellness, a d/b/a of Unete Healthcare, a limited liability company. (SUF 14.)  He has also been a sworn deputy probation officer in Los Angeles County for the last 16 years.  (SUF 15.)

### E.   Pronto Wellness

Ortiz founded Unete Healthcare in August 2018.  (SUF 16.)  Pronto started doing business as a d/b/a in May 2019.  (*Id.*)  On its website, Pronto claims to be "an independent auditing and reliable Clinical Compliance and Healthcare Management company" that provides "Student On-boarding Compliance Management" and "Clinical Compliance Management."  (SUF 17.)  Medina was listed as a co-founder of Pronto on an early National Provider Identifier ("NPI") record.  (SUF 18.)

## III.   FACTUAL BACKGROUND

### A.   Plaintiffs' Relationships With Clinical Partners Are Essential To the Success of Their Nursing Programs

State regulations require all nursing students in California to complete hands-on clinical training at healthcare institutions.  (SUF 19.)  The California Board of Registered Nursing requires nursing students to fulfill 75% of these clinical hours in "direct patient care" and in a "board-approved" setting.  (*Id.*)  These clinical rotations are a requirement for students to graduate and sit for their licensure exam.  (SUF 20.)

The CCR's requirement, coupled with the increasingly growing number of students seeking nursing degrees, makes securing and maintaining clinical rotations an extremely competitive process.  (SUF 21.)  Students cannot begin their rotations until they have completed a comprehensive clinical clearance process mandated by

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

the healthcare institutions.  (SUF 22.)

As a result, Plaintiffs' relationships with those healthcare institutions that provide clinical rotations for their students ("Clinical Partners") are essential for the success of their nursing programs – especially ACC's Associate Degree in Nursing program and WCU's BSN program.  (SUF 23.)  In the decades since their founding, ACC and WCU have carefully cultivated meaningful and productive relationships with these Clinical Partners.  (SUF 24.)

## B.    Pronto Emerges As a Competitor to ACC and WCU

Prior to May 2019, ACC and WCU worked directly with Clinical Partners to place and schedule students at clinical rotations.  (SUF 25.)  ACC and WCU undertook responsibility for collecting their students' paperwork, ensuring their eligibility, and clearing them to begin their rotations.  (SUF 26.)  The Clinical Partners did not charge ACC and WCU any fee to place their students in rotations.  (*Id.*)

Beginning May 2019, Pronto started marketing itself to Clinical Partners as a third party that could "streamline the clearance process" through "a new system designed to reduce, and in some cases, eliminate the time it takes for staff to clear students and start rotations."  (SUF 27.)  Clinical Partners began requesting that ACC and WCU use Pronto to register and clear their students for clinical rotations.  (SUF 28.)  By July 2019, at least seven of ACC's Clinical Partners were working with Pronto.  (*Id.*)  Pronto charged ACC and WCU a per-student fee for its services.  (SUF 29.)  As a result, ACC and WCU were now forced to pay for something they had always been able to do without cost.  (*Id.*)

## C.    Mario Medina Advances Pronto's Interests While Working for ACC

While Medina was still an ACC employee, he began working as a paid consultant for Pronto.  (SUF 30.)  Between November 2019 to November 2020, Pronto paid Medina $62,000, with an hourly rate of $250 an hour.  (SUF 32.)  But

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

even before he officially joined Pronto's payroll, Medina was actively taking steps to promote Pronto's interests to the detriment of ACC.  For example:

        1.    <u>Medina Cements The Relationship Between Pronto and College Medical Center, One of Plaintiffs' Clinical Partners</u>

In May 2019, Medina joined Ortiz for a dinner meeting with Joe Avelino—the Chief Executive Officer of College Medical Center, a healthcare institution where Plaintiffs have for years sent students to complete clinical rotations—to discuss Pronto.  (SUF 33.)  The following month, Avelino signed an agreement with Pronto on behalf of College Medical Center, and delivered the agreement *to Medina* over lunch.  (SUF 34.)

In late April 2020, without disclosing anything to ACC about his role in cementing the relationship between College Medical Center and Pronto, Medina initiated a request for Plaintiffs to donate $4,900 to Mr. Avelino's newly founded academy, explaining that the donation would strengthen ties with executives of Plaintiffs' partnered hospitals.  (SUF 35.)

        2.    <u>Medina Is Instrumental In Convincing ACC To Work With Pronto</u>

In June 2019 – *after* the aforementioned dinner meeting between Medina, Ortiz and Mr. Avelino of College Medical Center to discuss Pronto – Medina told ACC's Chief Academic Officer ("CAO") that several of ACC's clinical partners were now requiring schools to use Pronto to clear students for clinical rotations.  (SUF 36.)  Medina forecast that Pronto would be expanding to more clinical partners quickly, and urged Plaintiffs to hire Pronto lest they lose clinical rotations to competitors.  (SUF 37.)  He implied the same in an email dated July 3, 2019 to the CAO and Campus Director of Nursing, noting that "as other schools are joining [Pronto], we do not want to lose our place" when ACC staff found Pronto was too expensive and that ACC had another option for the same services.  (SUF 38.)

Because of Medina's position of trust and close proximity to ACC's clinical partners, ACC agreed to utilize Pronto's services on Medina's recommendation.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

(SUF 39.)  On August 1, 2019, ACC and WCU entered into an Independent Contractor Agreement with Pronto.  (SUF 40.)  Medina did not disclose to Plaintiffs his or his brother's relationship to Pronto when Plaintiffs entered into the Independent Contractor Agreement.  (SUF 41.)  Plaintiffs would not have entered into the contract with Pronto but for Medina's statements regarding Pronto.  (SUF 42.)  Plaintiffs also would not have entered into or continued with the Contract if they had known about Medina's relationship to Pronto and Ortiz.  (*Id.*)

### 3.   Medina Conceals His Ties to Pronto

From June of 2019 through December of 2020, Medina never disclosed to Plaintiffs his or his brother's relationship to Pronto when Plaintiffs entered into the Independent Contractor Agreement.  (SUF 43.)  In fact, Medina actively hid his improper ties to Pronto.  For instance, Medina (falsely) told ACC's Chief Academic Officer at the outset that Pronto was run by "a brilliant female Asian doctor."  (SUF 44.)  Medina also sent emails to the ACC team promoting Pronto's services and referring to Pronto as a "vendor" rather than an organization to which he and his brother had ties.  (SUF 45.)

### 4.   Medina Recruits Other ACC Employees To Work for Pronto

Medina recruited at least two other ACC employees to work for Pronto.  First, according to Valdivia, Medina was the person who put him in touch with Ortiz to see if Pronto would hire Valdivia to do some paid side work.  (SUF 46.)

Second, ACC employee Angelica Trupiano (who was Medina's assistant at ACC) testified that at the end of 2019 (after Medina *admits* to being a paid contractor for Pronto), Medina recruited her to do side-work for Pronto while working for ACC.  (SUF 47.)  When she told him it felt "sneaky" and "uncomfortable," he assured her it was no problem and there was nothing wrong.  (*Id.*)

### 5.   Medina Ensures ACC Pays Pronto's Improper Invoices

While working simultaneously for both Pronto and ACC, Medina also used his position at ACC to resolve ACC's questions about Pronto's invoices without

disclosing his affiliation or the fact that he was getting paid by Pronto.  On at least two separate occasions after Medina began working as a paid contractor for Pronto, ACC's Executive Director for the Ontario Campus reached out with questions about Pronto's invoices.  (SUF 48.)   On both occasions, Medina assured her that the invoices were for services provided by "a vendor," and she agreed to pay them – though noting that "it is a bit awkward for me to approve so many of these when there is no detail included on the payment requests."  (*Id.*)

### D.  Rolando Valdivia Promotes Pronto's Interests While Working for ACC

Valdivia claims that he started working for Pronto in August 2019.  (SUF 49.)  However, as early as June 2019 – the month Medina first told ACC about Pronto – Valdivia was sending emails to ACC from a Pronto email account under the fake name of Raul Valdez (which was the name Ortiz directed him to use when conducting Pronto business with Plaintiffs and clinical partners).  (SUF 50.)

Valdivia worked as a contractor for Pronto only during the period Plaintiffs were utilizing Pronto's services.  (SUF 51.)   From September 2019 to August 2020, Pronto paid Valdivia $10,095 for "Marketing/Branding & Communications."  (SUF 52.)  During his employment at ACC, Valdivia worked for and actively supported Pronto's business activities at the expense of Plaintiffs, in at least the following ways.

#### 1.  Valdivia Pressures Plaintiffs to Use Pronto

Like Medina, Valdivia used his position at ACC to encourage Plaintiffs to use Pronto, without disclosing his ties to the company.  For example, on June 18, 2019, Valdivia wrote an internal e-mail within ACC implying Plaintiffs would lose access to the clinical sites if Plaintiffs did not utilize Pronto's services.  (SUF 53.)  In one instance, he sent an email to Pronto on behalf of ACC committing ACC to using Pronto's services at several sites.  (SUF 54.)

#### 2.  Valdivia Conceals His Identity From Plaintiffs

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

As noted above, Valdivia used the fake name Raul Valdez (or "Raul Val") when conducting Pronto business with Plaintiffs and clinical partners.  (SUF 79.)  For example, on June 19, 2020, Valdivia, posing as Raul Valdez, emailed his colleagues at ACC and others from his *raul@prontowellness.com*.  (SUF 55.)  Valdivia included his ACC e-mail, *rValdivia@americancareercollege.edu*, as a recipient of the June 19, 2020 e-mail.  (*Id.*)  Within 20 minutes, Valdivia used his ACC account to forward the Raul Valdez email to his colleagues at ACC stating, "Please see the email below from Pronto Wellness regarding ReNew Health Group and let me know if you would like to ask for rotations at any of the sites listed."  (*Id.*)

### 3. Valdivia Uses His Inside Knowledge From ACC To Solicit Business For Pronto

Valdivia used the knowledge he gained at ACC and ACC's established relations and reputation with healthcare institutions to secure business for Pronto.  (SUF 56.)  Valdivia also visited Plaintiffs' clinical partners as "Raul Val" to conduct Pronto's business.  (SUF 57.)  At least one Clinical Partner was confused and asked whether Valdivia worked for ACC or Pronto.  (*Id.*)

### 4. Valdivia Devotes His Time, Talents, and Expertise To Promoting Pronto's Competing Business

While employed at ACC, Valdivia devoted his time, talents and expertise to promote Pronto's business.  For example, he prepared PowerPoint presentations that Pronto used to pitch its services to Plaintiffs' Clinical Partners and vendors.  (SUF 58.)  He assisted with creating the Pronto invoice templates that Pronto used to bill educational institutions, including ACC and WCU, for Pronto's services in connection with the clinical clearance process.  (SUF 59.)  And he provided services not just to Pronto, but also to Pronto's other school clients (including Plaintiffs' competitors).  (SUF 60.)

### E. Pronto and Ortiz Aid and Abet Medina and Valdivia's Double Dealing

Pronto and Ortiz knew that Medina was an employee of ACC when Medina

contracted with Pronto.  (SUF 61.)  And Pronto and Ortiz knew that Valdivia was an ACC employee who worked with Medina before they hired Valdivia to work for Pronto.  (SUF 62.)

Pronto and Ortiz encouraged and furthered Medina and Valdivia's betrayal of Plaintiffs in several ways.  For example, as noted above, Ortiz directed Valdivia to use the fake name Raul Valdez when conducting Pronto business with Plaintiffs and clinical partners.  (SUF 50.)  He also did the same thing for ACC employee Angelica Trupiano, directing her to use the fake name "Angela" when corresponding regrading Pronto business.  (SUF 63.)

In a similar vein, Pronto's Regional Account Manager David Koz frequently included Valdivia on emails sent to an ACC employee team without providing any hint that the three of them worked together at Pronto.  (SUF 64.)  He also on at least one occasion asked Valdivia to on a project for another school.  (SUF 65.)

### F.    Defendants Caused Plaintiffs Substantial Damages

As a result of Defendants' fraud and breach of the duty of loyalty, Plaintiffs suffered substantial harm, in at least the following ways.

First, ACC paid more than $150,000 annually to Medina and more than $80,000 annually Valdivia while they were also working for Pronto.  (SUF 66.)

Second, Plaintiffs lost access to more than 25 major clinical sites – and hundreds of clinical placements for their students – when they stopped using Pronto, including but not limited to multiple sites with College Hospitals, Alta Hospitals Systems, Avanti Hospitals, and ReNew Health Group.  (SUF 67.)  Plaintiffs' lost access has resulted in significant monetary damages, including substantial costs to mitigate the damages (e.g., find alternative placements for their students, find alternative methods for verifying student information for clinical sites), as detailed below.  (SUF 68.)

Third, Plaintiffs paid Pronto $247,000 between August 2019 and December 2020.  (SUF 69.)  Absent Pronto's fraud, ACC and WCU would not have incurred

these costs because ACC and WCU had always historically worked directly with hospitals on clinical placements without cost.  (SUF 70.)  ACC and WCU "cleared" students for placement at Clinical Partner sites, and worked with the partner to schedule clinical rotations for ACC/WCU students.  (*Id.*)  They would have continued to do so, without cost, absent Pronto's interruption and misrepresentation of the process.  (*Id.*)

Fourth, after terminating Pronto, ACC and WCU were forced to hire additional administrative staff to manage and retain their relationships with clinical sites, as well as to identify and contract with replacement sites.  (SUF 71.)  ACC restructured its staff such that the roles previously filled by Mr. Medina and Mr. Valdivia were instead performed by an Executive Director of Strategic Partnerships and three Student Experience Managers.  (*Id.*)  This resulted in a net increase of two additional Student Experience Managers caused by Defendants' conspiracy.  (*Id.*)

Fifth, because of losing clinical sites after terminating the relationship with Pronto, WCU had to increase staffing for its tele-health program.  (SUF 72.)  The tele-health program had been developed, in part, in response to the COVID-19 pandemic.  (*Id.*)  But, the number of students enrolled in tele-health increased dramatically as a result of the Pronto termination because, unexpectedly, hundreds of students had to finish their clinical rotations but had no place to go besides tele-health.  (*Id.*)  This increase was temporary and occurred from approximately February 1, 2021, to June 14, 2021.  (*Id.*)  During that time, WCU reassigned five employees to work on the tele-health program who otherwise would not have been staffed on the program.  (*Id.*)

Sixth, WCU incurred incremental costs associated with finding replacement clinical partner sites. (SUF 73.)  Specifically, WCU paid education grants to many of the clinical partners that it was able to secure rotations with as replacements for those lost, and that these grant payments were in excess of what would have been required

absent Pronto's actions.  (*Id.*)

Seventh, as a result of terminating its relationship with Pronto, ACC was also forced to increase its reliance on (and therefore its costs associated with) an online simulation software provider, Swift River, to replace some of its students' on-site clinical rotations.  (SUF 80.)  Although ACC had already been using Swift River for online learning due to COVID, ACC's needs increased significantly as a result of terminating its relationship with Pronto in December 2020, as many students were unexpectedly left without clinical sites.  (*Id.*)

Though Plaintiffs are not moving for partial summary judgment on the *amount* of their damages at this juncture, these damages were substantial.

## IV.  STATEMENT OF LAW

### A.  Summary Judgment Standard

Summary judgment is appropriate where the moving party shows that no genuine dispute as to any material fact exists and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Valenzuela v. ADT Sec. Servs., Inc.*, 820 F. Supp. 2d 1061, 1068 (C.D. Cal. 2010).  While the Court must read the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party, the nonmoving party must identify specific facts, drawn from the materials on file, that show that an issue is genuinely disputed.  *Greenwich Ins. Co. v. Media Breakaway*, LLC, 2009 WL 2231678, at *4 (C.D. Cal. July 22, 2009); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1984).  The non-moving party must do more than make "conclusory allegations [in] an affidavit."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  If the nonmoving party's "evidence is merely colorable or is not significantly probative," then summary judgment may be granted.  *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016).

### B.  Breach of the Duty of Loyalty

The elements of a cause of action for breach of a duty of loyalty, by analogy to a claim for breach of fiduciary duty, are as follows: (1) the existence of a relationship

giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach.  *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (2007), *accord. Erhart v. BofI Holding, Inc.* (S.D. Cal., Mar. 31, 2020, No. 15-CV-02287-BAS-NLS) 2020 WL 1550207, at *40.

"[A] person cannot serve two masters simultaneously." *Stokes v. Dole Nut Co*., 41 Cal. App. 4th 285, 296 (1995) (internal quotation marks omitted).  Therefore, "an employer's right to undivided loyalty is compromised when an employee's outside activities give rise to a possibility of personal influences." *Id*.

"The duty of loyalty is breached, and the breach 'may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer.'" *Erhart v. BofI Holding, Inc.* (S.D. Cal., Mar. 31, 2020, No. 15-CV-02287-BAS-NLS) 2020 WL 1550207, at *40 (quoting *Huong Que, Inc. v. Luu*, 150 Cal. 4th 400, 414 (2007).)  Inimical means: "1. Behaving like an enemy; hostile. 2. Opposite or adverse in effect or tendency." *Id.*, citing *Inimical*, Black's Law Dictionary (10th ed. 2014).

## C.  <u>Aiding and Abetting Breach of the Duty of Loyalty</u>

Liability for aiding and abetting breach of a duty (such as the duty of loyalty) may be found where the aider and abettor (1) knows that the "underlying conduct constitutes a breach of duty" and provides "substantial assistance or encouragement to such conduct," or (2) gives substantial assistance to another in accomplishing a tortious result and the aider and abettor's own conduct, separately considered, constitutes a breach of duty to a third person.  *Sunrider Corp. v. Bountiful Biotech Corp.*, No. SACV081339DOCAJWX, 2010 WL 11596235, at *5 (C.D. Cal. June 4, 2010); *accord Softchoice Corp. v. En Pointe Techs., Inc.*, No. SC088295, 2006 WL 3350798, at *2 (Cal. Super. Ct. Nov. 13, 2006) (stating that California law recognizes an aiding and abetting claim of breach of fiduciary duty).

## V.  <u>ARGUMENT</u>

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

**A.** **Plaintiffs Are Entitled To Partial Summary Judgment On the Duty of Loyalty Against Medina**

All the elements of Plaintiffs' breach of duty of loyalty claim against Medina are met.

1.   Medina Owed Plaintiffs a Duty of Loyalty

   a.   *Medina's Duty of Loyalty to ACC*

Medina was an employee of ACC.  (SUF 2.)  As ACC's employee, Medina owed ACC a duty of loyalty.  All employees owe "an undivided duty of loyalty" to their employer during the course of their employment.  *Faraday&Future, Inc. v. Evelozcity, Inc.*, No. CV 18-737-DMG (RAOX), 2018 WL 11346536, at *2 (C.D. Cal. Aug. 9, 2018) (quoting *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (2007)).  This includes both managerial and lower-level employees.  *Erhart v. BofI Holding, Inc.*, No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *4 (S.D. Cal., Mar. 31, 2020) ("California courts generally have not distinguished between managerial employees and lower-level employees with respect to the duty of loyalty.").  The Central District of California recognizes as "elementary that officers and directors cannot use their powers for their personal advantage." *Royal Indus. v. Monogram Indus.*, Nos. CV 76-3348-R, CV 76-3356-R, 1976 U.S.Dist.LEXIS 12090, at *20 (C.D.Cal. Nov. 29, 1976).

   b.   *Medina's Duty of Loyalty to WCU*

As an employee of ACC, Medina also owed a duty of loyalty to its sister institution, WCU.  Case law indicates that under certain circumstances, an employee's duty to his employer may also extend to affiliated entities with common ownership.  For example, "California courts have recognized that the fiduciary of a subsidiary also owes a fiduciary duty to the subsidiary's parent corporation."  *PQ Labs, Inc. v. Yang Qi*, No. 12-0450 CW, 2014 WL 334453, at *12 (N.D. Cal. Jan. 29, 2014); *accord. Richardson v. Reliance Nat'l Indem. Co.,* No. C–99–2952, 2000 WL 284211, at *12 (N.D. Cal. Mar. 9, 2000) (concluding that California courts would

hold that a director of a subsidiary owes fiduciary duties to the shareholders of the parent corporation); *Thomas Weisel Partners LLC v. BNP Parabas*, No. C 07-6198 MHP, 2010 WL 1267744, at *6 (N.D. Cal. Apr. 1, 2010) (holding that as a matter of law, a principal and senior officer of one company owed a fiduciary duty to the parent company).

In this instance, Medina's duty of loyalty to WCU is particularly clear given that the schools' interests and strategies are closely aligned when it comes to relationships with Clinical Partners and student placements.  (SUF 74.)  ACC and WCU utilize many of the same Clinical Partners for their students' clinical rotations. (*Id.*)  In fact, close to 70% of ACC's current Clinical Partners also host WCU students.  (*Id.*)  The two schools presently work closely together to share strategies, insights, and resources related to their Clinical Partners.  (SUF 75.)

For example, in the beginning of 2020, Medina co-led a joint strategic planning meeting for with his counterpart at WCU to discuss how the schools could better work together to develop relationships with Clinical Partners that would benefit students at both schools.  (SUF 76.)  When something negatively affects ACC's relationships with Clinical Partners, it also affected WCU.  (SUF 77.)  In his position at ACC, Medina had access to WCU's database of Clinical Partners, student documents, and other related materials.  (SUF 78.)

2.     <u>Medina Breached His Duty of Loyalty to Plaintiffs</u>

Medina breached his duty of loyalty to Plaintiffs.  As this Court correctly noted in its Minute Order Denying Defendants' Motion for Judgment On the Pleadings (Dkt. 39), actions that California courts have found to be a breach of the duty of loyalty include: (1) competing with the principal or taking action on behalf of or otherwise assisting the principal's competitors; (2) acquiring a material benefit from a third party through the agent's use of the agent's position; and (3) communicating confidential information of the principal for the agent's own purposes or those of a third party.  (Dkt. 39 (citing *Huong Que, Inc. v. Luu*, 150

Cal.App.4th 400, 416 (Cal. Ct. App. 2007).)  The undisputed material evidence shows that he did the first two things, and strongly suggests he did the third as well.

        *a.*      *Medina Acted On Behalf of Pronto, Whose Interests Were Adverse to Plaintiffs*

Courts evaluating whether an employee who engaged in competitive behavior violates the duty of loyalty to a current employer often focus on whether the employee is just *preparing* to compete (which is permitted) or actually crossing the line and engaging in competitive or harmful behavior while still employed.  While the duty of loyalty is breached by "preparing to compete with [one's] employer," *Mamou v. Trendwest Resorts, Inc.*, 165 Cal.App.4th 686, 719 (Cal. Ct. App. 2008) (italics omitted), that preparatory activity ripens into a breach once the employee "use[s] his or her [employer's] time, facilities or proprietary secrets to build the competing business," *Techno Lite, Inc. v. Emcod, LLC*, 44 Cal.App.5th 462, 473 (Cal. Ct. App. 2000).  "[A]n agent is free to engage in competition with his principal *after* termination of his employment but he may plan and develop his competitive enterprise during the course of his agency only where the particular activity engaged in *is not against the best interests of his principal*." *Sequoia Vacuum Systems v. Stransky*, 229 Cal.App.2d 281, 287 (Cal. Ct. App. 1964) (emphasis added).  Here, Medina's actions undisputably crossed the line from preparatory behavior to actual harmful behavior, in at least the following ways.

Medina took action on behalf of Pronto while employed by ACC, including promoting Pronto's services even though doing so would require Plaintiffs to incur hundreds of thousands of dollars in additional costs.  Medina did so by lying about Pronto (SUF 44), hiding his relationship with Pronto (SUF 41), and falsely claiming that if Plaintiffs didn't use Pronto, they would lose their clinical site placements (the lifeblood of their nursing programs).  (SUF 38.)  Pronto's interests were averse to Plaintiffs: each time Medina and his co-conspirators convinced a clinical partner to use Pronto, Plaintiffs were forced to pay Pronto or risk losing the crucial clinical

partnership and hundreds of clinical rotations for their students to a competitor school.  (SUF 28, 48, 53.)  Absent Pronto's interference, Plaintiffs would have been able to continue with their existing arrangements with Clinical Partners without cost. (SUF 70.)

Simply the act of negotiating contracts between ACC and Pronto without disclosing the potential conflict is sufficient to constitute a breach of the duty of loyalty.  For example, in *Skyline Advanced Technology Services v. Shafer*, No. 18-CV-06641-CRB, 2021 WL 5908387, at *9 (N.D. Cal. Dec. 14, 2021), the Northern District Court of California granted summary judgment for an employer on its breach of duty of loyalty claims against an employee who, among other things, negotiated an agreement on her employer's behalf with a company she planned to work for in the future – without disclosing the relationship or the potential conflict.  The District Court reasoned that "When Shafer signed an agreement to work for Xentaurs while still working for Skyline and negotiating a deal on Skyline's behalf with Xentaurs and Cisco, ***Shafer's activities gave rise to a possibility of personal influences***."  *Id.* (emphasis added).  The same is undisputably true here.

Additionally, Medina breached his duty of loyalty to Plaintiffs by actively recruiting other ACC employees (his direct reports, Rolando Valdivia and Angelica Trupiano) to covertly work for Pronto.  (SUF 46–47.)  A current employee may not solicit fellow employees to work for a competing business.  *Arriaga v. Lara*, No. H046183, 2020 WL 995141, at *21 (Cal. Ct. App., Mar. 2, 2020) (citations omitted); *Skyline Advanced Technology Services v. Shafer*, No. 18-CV-06641-CRB, 2021 WL 5908387, at *9 (N.D. Cal., Dec. 14, 2021) ("Poaching Skyline employees for Xentaurs also breached Shafer's duty of loyalty to Skyline. Shafer admits that she recruited Skyline employees to join Xentaurs while she still worked for Skyline.") When Trupiano expressed to Medina that the arrangement made her feel "uncomfortable" and "sneaky," Medina assured her that nothing was wrong.  (SUF 47.)

     *b.*     *Medina Used His Position With ACC to Obtain a Material Benefit For Himself, His Brother, and His Brother's Company*

Second, Medina personally profited from his double-dealing. From August 2019 and December 2020, Plaintiffs paid Pronto $247,000. (SUF 69.) During that same timeframe, Pronto paid Medina $62,000. (SUF 32.) Medina used his position to ensure ACC paid Pronto's invoices, even when ACC's Executives questioned the bills (SUF 48) – likely because Medina knew he would not be paid until Pronto was paid. In this way, this case resembles *County of Marin v. Deloitte Consulting LLP,* 836 F.Supp.2d 1030, 1050–1051 (N.D. Cal. 2011), in which the Northern District Court of California found that allegations that an employee approved project deliverables that were defective or non-compliant, on behalf of an outside company that was providing him "expensive meals" and discussing potential employment opportunities, without disclosing these benefits to employer, were sufficient to plead a breach of the duty of loyalty. Like the employee in *County of Marin*, Medina was also encouraging his employer to enter into contracts that were to the benefit of Pronto, not to Plaintiffs, without disclosing the personal relationship or conflict to ACC.[2]

     3.     <u>Medina's Breach of Duty Caused Plaintiffs to Suffer Harm</u>

Of the many ways that ACC suffered harm was by having to pay Medina wages as an ACC employee simultaneously while he was secretly working to promote Pronto's interests over ACC. An employer is damaged by paying wages to an unfaithful employee. *Skyline Advanced Technology Services v. Shafer*, No. 18-CV-06641-CRB) 2021 WL 5908387, at *9 (N.D. Cal., Dec. 14, 2021); *see also J.C. Peacock, Inc. v. Hako*, 196 Cal. App. 2d 353, 359 (1961) ("an employee's disloyalty will work a forfeiture of his right to recover the stipulated compensation"); and

---

[2] We anticipate the trial evidence will show that Medina also breached his duty of loyalty by leaking Plaintiffs' confidential information and trade secrets to Pronto, but given the high evidentiary bar required for summary judgment of *undisputed* evidence, we will reserve this issue for trial.

*ChromaDex, Inc. v. Elysium Health, Inc.*, No. SACV 16-2277-CJC (DFMx), 2020 WL 1279236, at *18 (C.D. Cal. Jan. 16, 2020) ("[A]n employee who violates the[ ] fundamental duties of loyalty cannot recover even for the services he has rendered.").  From January 2018 to December 2020, ACC paid Medina more than $150,000 per year.  (SUF 7.)

Plaintiffs were further damaged by Medina's breach of loyalty because they would not have entered into the Contract but for Medina's purportedly neutral assessment that they would lose their clinical sites unless they agreed to work with Pronto.  (SUF 37–38.)  Plaintiffs also would not have entered into the Contract had they known Medina's relationship with Pronto, nor would Plaintiffs have incurred the fees to pay Pronto but for Pronto's meddling in Plaintiffs' relationships with its clinical partners.  (SUF 29, 42, 70.)  Accordingly, Medina's breach of loyalty, including his lies, deception, and double-dealing, caused Plaintiffs' harm – including all the money paid to Pronto and the lost profits resulting from losing clinical sites after terminating Pronto.  (SUF 71–72.)

## B. Plaintiffs Are Entitled To Partial Summary Judgment On the Duty of Loyalty Against Valdivia

All the elements of Plaintiffs' breach of duty of loyalty claim against Valdivia are met.

### 1. Valdivia Owed Plaintiffs a Duty of Loyalty

#### a. *Valdivia Owed A Duty of Loyalty to ACC*

Valdivia was also an employee of ACC during the relevant time period; thus he owed Plaintiffs a duty of loyalty.  (SUF 8.)  Regardless of the differences between his title and Medina's, both defendants still owed their employer a duty of loyalty.  "California courts generally have not distinguished between managerial employees and lower-level employees with respect to the duty of loyalty." *Erhart v. BofI Holding, Inc.*, No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *4 (S.D. Cal., Mar. 31, 2020).

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

b.     *Valdivia Owed A Duty of Loyalty to WCU*

For the same reason Medina owed a duty to ACC's sister school WCU, Valdivia also owed a duty to WCU.

2.     <u>Valdivia Breached His Duty of Loyalty to Plaintiffs</u>

Valdivia breached his duty of loyalty to Plaintiffs.  Returning to the trio of actions that California courts have found to be a breach of the duty of loyalty, see *supra* – (1) competing with the principal or taking action on behalf of or otherwise assisting the principal's competitors; (2) acquiring a material benefit from a third party through the agent's use of the agent's position; and (3) communicating confidential information of the principal for the agent's own purposes or those of a third party – Valdivia did all three of these things.  Like Medina, Valdivia's actions crossed the line from *preparing* to compete with ACC to actually engaging in competitive behavior.

a.     *Valdivia Acted On Behalf of Pronto, Whose Interests Were Adverse to Plaintiffs*

Valdivia took action on behalf of Pronto while employed by Plaintiffs, including using a fake name to surreptitiously promote Pronto's services and communicate with Plaintiffs' representatives and healthcare partners regarding Pronto business (SUF 50, 79); creating PowerPoint presentations for Pronto to make a business pitch to healthcare institutions with whom Plaintiffs had clinical ties (SUF 58); and creating the Pronto invoice templates that Pronto utilized to charge educational institutions, including ACC and WCU, for Pronto's services in connection with the clinical clearance process (SUF 59).  Valdivia also visited clinical sites using his fake identity to pitch Pronto's services, without identifying himself as an ACC employee.  (SUF 57.)

Valdivia didn't just help Pronto with his efforts, he also helped ACC's direct competitors – other colleges competing for the same limited clinical rotation slots for their students.  (SUF 60.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        *b.    Valdivia Materially Benefitted From His Double Dealing*

Like Medina, Valdivia received significant compensation for his misrepresentations.  From September 2019 to August 2020, Pronto paid Valdivia $10,095 for supporting its business at Plaintiffs' expense — services that Pronto described as "Marketing/Branding & Communications."[3]  (SUF 52.)

      3.    Valdivia's Breach of Duty Caused Plaintiffs to Suffer Harm

Plaintiffs were harmed by Valdivia's breach of loyalty in the same way they were harmed by Medina's.  First, Plaintiffs were damaged because they had to pay Valdivia compensation during the time he was working for Pronto. *See Skyline Advanced Technology Services v. Shafer* (N.D. Cal., Dec. 14, 2021, No. 18-CV-06641-CRB) 2021 WL 5908387, at *9 ("An employer is damaged by paying wages to an unfaithful employee") (citations omitted).  From February 2018 to December 2020, ACC paid Valdivia more than $80,000 per year.  (SUF 12.)

Further, as noted *supra*, Plaintiffs would not have entered into the Contract had they known about Valdivia's deception (i.e. lies, fake names) or his relationship with Pronto.  (SUF 42.)  Accordingly, Valdivia's breach of loyalty, including his lies, deception, and double-dealing, was a cause of Plaintiffs' harm – including all the money paid to Pronto and the lost profits resulting from losing clinical sites after terminating Pronto.  (SUF 71–72.)

**C.    Plaintiffs Are Entitled To Partial Summary Judgment On Aiding and Abetting the Duty of Loyalty as To Defendants Ortiz, Pronto**

Plaintiffs are further entitled to partial summary judgment on their causes of action against Pronto and Ortiz for aiding and abetting Medina and Valdivia's breach of their duty of loyalty to their employer.

California courts recognize a separate cause of action for aiding and abetting an employee's breach of the duty of loyalty to his or her employer.  For example, in

---

[3] Like Medina, the trial evidence will show that Valdivia communicated Plaintiffs' confidential information for Pronto's benefit, but Plaintiffs are not moving for summary judgment on the trade secrets issue at this time.

a factually-analogous case, the California Court of Appeal affirmed a $3 million jury verdict in favor of a nursing staffing company against two of its former employees who secretly recruited nurses for a competitor's staffing company while working for the plaintiff, *and against the competitor's staffing company and its principal for aiding and abetting the employees' breach of loyalty. Medipro Medical Staffing, LLC v. Certified Nursing Registry, Inc.*, No. B294391, 2021 WL 387879, at *7 (Cal. Ct. App., Feb. 4, 2021). In a passage with some striking factual parallels to the facts of this case, the *Medipro* court explained:

> Substantial evidence supports the jury's verdict that Sy (and, by extension, Certified) knew of Labora's and Greter's breaches of their fiduciary duty and duty of loyalty to Medipro and substantially encouraged those breaches. Sy was like a "sister" to Labora and was long-time friends with Greter; Sy knew Labora's and Greter's high-ranking positions at Medipro and had extended them an "open offer" to return; Sy and Labora spoke dozens of times a month in early 2017; Sy, Labora and Greter went to dinner in May 2017 to finalize Greter's imminent departure from Medipro and his arrival at Certified; Sy sweetened the proverbial pot by opening up a new office just for Labora and Greter to run and by offering them a starting bonus that no other Certified employee had previously been offered, ostensibly to make up for the money they would lose from not getting a contractual loyalty bonus from Medipro; Sy took no action whatsoever to prohibit Labora and Greter from using Medipro's registry to recruit nurses for Certified; and by the end of 2017, 40 of Medipro's most reliable and sought-after nurses had left Medipro to move to Certified.

*Id.*

Just like in *Medipro*, the undisputed evidence establishes that Ortiz and Pronto (who for all intents and purposes are effectively one and the same) knew of Medina's and Valdivia's breaches of loyalty to Plaintiffs and substantially encouraging them, in at least the following ways:

- Pronto and Ortiz were aware of Medina and Valdivia's employment at ACC when they offered them positions at Pronto. (SUF 61–62.)

- Ortiz is Medina's brother and Medina was aware of Pronto's solicitation of ACC's Clinical Partners as early as May 2019. (SUF 13, 29.)

- Pronto created a false Pronto email account for Valdivia when it hired him as a contractor. (SUF 50.)

- Ortiz directed Valdivia to use a fake name Raul Valdez when conducting Pronto business with Plaintiffs and clinical partners. (SUF 50.)

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

- In addition to engaging Medina and Valdivia to work as contractors for Pronto, Pronto and Ortiz hired Angelica Trupiano – the current ACC Student Experience Manager – when she was a project assistant to Medina, and also instructed her to use a false name. (SUF 47.)

## VI.   **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court enter summary judgment on Plaintiffs' behalf in the form of the proposed order submitted herewith.

Dated: May 13, 2022                **DUANE MORRIS LLP**

By:   */s/ Patricia P. Hollenbeck*
Edward M. Cramp, Esq.
Patricia P. Hollenbeck, Esq.
Karen L. Alexander, Esq.

Plaintiffs/Counter-Defendants
American Career College, Inc. and
West Coast University, Inc.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT